1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RODNEY GAINES, | ) Case No. CV 14-5910-JPR |
| | ) |
|             Petitioner, | ) |
| | ) MEMORANDUM OPINION AND ORDER |
|       vs. | ) DENYING PETITION AND DISMISSING |
| | ) ACTION WITH PREJUDICE |
| CYNTHIA Y. TAMPKINS, | ) |
| Warden, | ) |
| | ) |
|            Respondent. | ) |

**PROCEEDINGS**

     On July 29, 2014, Petitioner filed a Petition for Writ of
Habeas Corpus by a Person in State Custody, raising seven claims.
That same day, he filed an "election regarding consent" form,
stating that he "voluntarily consent[ed] to have a United States
Magistrate Judge conduct all further proceedings in this case,
decide all dispositive and non-dispositive matters, and order the
entry of final judgment." On October 15, 2014, Respondent filed
an Answer and Memorandum of Points and Authorities; she also
consented to proceed before a Magistrate Judge. On October 28,
2014, Petitioner filed a reply.

     For the reasons discussed below, the Petition is denied and
this action is dismissed with prejudice.

1

**PETITIONER'S CLAIMS**

I. "Insufficient evidence to convict for burglary." (Pet. at 5.)

II. "The elements of burglary were not proven beyond a reasonable doubt." (<u>Id.</u>)

III. "The elements of simple assault were not proven beyond a reasonable [doubt]." (<u>Id.</u>)

IV. "Insufficient evidence to convict for simple assault." (<u>Id.</u> at 6.)

V. "The state failed to follow the standard of CALCRIM 252." (<u>Id.</u>)

VI. "False evidence used to convict." (<u>Id.</u> at 9.)

VII. "Prosecutorial misrepresentation/misconduct rising to the level of a violation of due process under the Fourteenth Amendment." (<u>Id.</u> at 10.)

**BACKGROUND**

On December 10, 2012, Petitioner was convicted by a Los Angeles County Superior Court jury of simple assault, in violation of California Penal Code section 240(a), and commercial burglary, in violation of section 459. (Lodged Doc. 1, Clerk's Tr. at 189-90; Lodged Doc. 3, 4 Rep.'s Tr. at 2407-08.) On December 31, 2012, the court sentenced Petitioner to four years in state prison. (Lodged Doc. 1, Clerk's Tr. at 241-42; Lodged Doc. 3, 4 Rep.'s Tr. at 2721-22.)

Petitioner appealed, raising a claim corresponding to ground one of the Petition. (Lodged Doc. 4.) On November 7, 2013, the California Court of Appeal affirmed the judgment. (Lodged Doc. 7.) Petitioner thereafter raised the same issue in a petition

2

1  for review (Lodged Doc. 10); on January 15, 2014, the California
2  Supreme Court summarily denied it (Lodged Doc. 11).

3      Meanwhile, on February 13, 2013, Petitioner filed a habeas
4  petition in the California Court of Appeal, raising claims
5  corresponding to ground one and parts of grounds two, six, and
6  seven.  (Lodged Doc. 8.)  On November 7, 2013, the court of
7  appeal summarily denied the petition.  (Lodged Doc. 9.)  On April
8  4, 2014, Petitioner filed a habeas petition in the state supreme
9  court, raising claims corresponding to grounds two through seven.
10  (Lodged Doc. 12.)  On June 11, 2014, the supreme court summarily
11  denied the petition.  (Lodged Doc. 13.)

12                      **SUMMARY OF THE EVIDENCE**

13      Because Petitioner challenges the sufficiency of the
14  evidence to support his convictions, the Court has independently
15  reviewed the state-court record.  See Jones v. Wood, 114 F.3d
16  1002, 1008 (9th Cir. 1997).  Based on this review, the Court
17  finds that the following statement of facts from the California
18  Court of Appeal opinion on direct review fairly and accurately
19  summarizes the evidence.  See 28 U.S.C. § 2254(e)(1) (in habeas
20  proceedings involving "a person in custody pursuant to the
21  judgment of a State court, a determination of a factual issue
22  made by a State court shall be presumed to be correct").  But see
23  Murray v. Schriro, 745 F.3d 984, 1001 (9th Cir. 2014) (discussing
24  "state of confusion" in circuit's law concerning interplay of
25  § 2254(d)(2) and (e)(1)).

26      At  around  11:00  p.m.  on  June  24,  2012,  Luis
27  Gomez-Alcala (Alcala) was working as a cashier at a gas
28  station on West Avenue K in Lancaster.  The gas station

                                3

included a small convenience store selling drinks,
cigarettes, snacks and similar items. Mr. Alcala was
inside the store assisting a customer when the customer
told him there was a man outside near the gas pumps
asking for money and bothering the customers. Part of
Mr. Alcala's assigned job duties was to tell panhandlers
at the station to leave the premises.

After the customer finished paying, Mr. Alcala went
outside and saw [Petitioner] near the gas pumps.
[Petitioner] had a black backpack, as well as a bicycle
with several bags on it. Mr. Alcala told [Petitioner] to
stop "molest[ing] my customer[s];" that if he did not
stop he would have to call the police or he would get in
trouble with his manager. [Petitioner] responded calmly,
said "okay" and left the premises.

After some time had passed, two more customers
complained there was a man bothering them outside and
asking for money. Mr. Alcala looked out the window and
saw that [Petitioner] had returned and was again by the
gas pumps. He again went outside and told [Petitioner]
to leave. [Petitioner] was angry, spoke in a loud voice
and mocked Mr. Alcala. Mr. Alcala raised his voice as
well and reiterated that he had to leave. Mr. Alcala
then went back inside the store, but saw that
[Petitioner] still had not left. He went back outside
and told [Petitioner] he had to go. [Petitioner] "was
more aggressive. . . . He [got] madder." [Petitioner]
told Mr. Alcala he was only trying to get money to eat

4

and Mr. Alcala had no right to tell him to leave or call the police. [Petitioner] eventually left the gas station. On cross-examination, Mr. Alcala conceded he may have testified at the preliminary hearing that he only dealt with [Petitioner] twice, and not three times.

Around 1:00 a.m., Mr. Alcala was inside the store, waiting for a couple of customers to decide what they were going to purchase. While behind the register, Mr. Alcala was not protected by any bullet-proof glass, nor did he have access to any weapon to use in self-defense. [Petitioner] entered the store, wearing the same black backpack Mr. Alcala had seen him with earlier. [Petitioner] immediately began yelling at Mr. Alcala, as well as pointing and gesturing in his direction. The couple that was in the store appeared to Mr. Alcala to be scared by [Petitioner's] conduct and left.

Mr. Alcala felt nervous because of [Petitioner's] aggressive behavior, and he did not know if [Petitioner] had some sort of weapon. Mr. Alcala started to back away and grabbed his cell phone so he could call 911. Mr. Alcala was afraid and thought [Petitioner] was going to hurt him. Mr. Alcala became more scared because [Petitioner] kept yelling louder and coming closer to him. [Petitioner] yelled obscenities at Mr. Alcala, such as "Don't you ever f----n talk to me like you did before you bitch . . . if you, f--- you and the cops mother f----n bitch. If you ever talk to me like that again I'm gonna go over this counter and beat the f--- out of you,

punk.  Think I'm lying, you think I'm lying?  I'm gonna beat your mother f----n ass, you bitch.  F--- you."  "I'm a soldier, mother f----r.  Call the cops you bitch.  You don't know who you're f----g with, dude."  Mr. Alcala felt [Petitioner] had threatened to hit him and "beat" him.  Portions of the video surveillance tapes from inside the store showing the incident, including the words [Petitioner] yelled at Mr. Alcala, were played for the jury.

[Petitioner] then picked up one of the empty cash register trays and threw it at Mr. Alcala.  Mr. Alcala moved quickly to one side and avoided being hit in the face.  Mr. Alcala told [Petitioner] he needed to control himself or he would call the police.  [Petitioner] was only about four feet away and did not stop yelling at Mr. Alcala, so he called 911.  [Petitioner] then abruptly left the store and Mr. Alcala saw him riding his bike down West Avenue K.  The deputy sheriffs arrived in a few minutes.  [Petitioner] was detained about a mile from the gas station, no weapons were found on him, and the arresting deputy did not believe he appeared to be under the influence.

[Petitioner] was charged by amended information with one count of making criminal threats (Pen. Code, § 422, subd. (a); count 1), one count of assault with a deadly weapon (§ 245, subd. (a)(1); count 2), and one count of second degree burglary (§ 459; count 3). . . . [Petitioner] pled not guilty and moved to represent

6

1    himself.   The court made the requisite admonitions and
2    determined [Petitioner] voluntarily and intelligently
3    waived his right to appointed counsel.

4        The case proceeded to trial by jury in November
5    2012.    The  jury  returned  a  verdict  acquitting
6    [Petitioner]  on  counts  1  and  2,  but  convicting
7    [Petitioner] on the lesser included charge of misdemeanor
8    assault (§ 240) as to count 2.   The jury also convicted
9    [Petitioner] of second degree burglary in count 3.
10   (Lodged Doc. 7 at 2-4 (footnote omitted).)

11                        **STANDARD OF REVIEW**
12       Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism
13   and Effective Death Penalty Act of 1996:

14       An application for a writ of habeas corpus on behalf of
15       a person in custody pursuant to the judgment of a State
16       court shall not be granted with respect to any claim that
17       was adjudicated on the merits in State court proceedings
18       unless the adjudication of the claim — (1) resulted in a
19       decision  that  was  contrary  to,  or  involved  an
20       unreasonable application of, clearly established Federal
21       law, as determined by the Supreme Court of the United
22       States; or (2) resulted in a decision that was based on
23       an unreasonable determination of the facts in light of
24       the evidence presented in the State court proceeding.

25       Under AEDPA, the "clearly established Federal law" that
26   controls federal habeas review consists of holdings of Supreme
27   Court cases "as of the time of the relevant state-court
28   decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).

                                7

Although a particular state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. Id. at 391, 412-13. A state-court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537 U.S. 3, 8 (2002). A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Id.

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts' (emphasis added)." Id. at 11 (quoting § 2254(d)). A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. Williams, 529 U.S. at 407-08. To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Id. at 409-10. In other words, habeas relief is warranted only if the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

8

Petitioner raised ground one of the Petition before the state court of appeal on direct appeal (Lodged Doc. 4) and in a habeas petition (Lodged Doc. 8).  On the same day, the court of appeal rejected his claim on direct appeal in a reasoned decision (Lodged Doc. 7) and denied the habeas petition without comment (Lodged Doc. 9).  The California Supreme Court subsequently denied Petitioner's petition for review without comment or citation to authority.  (Lodged Doc. 11.)  The Court therefore "looks through" the state supreme court's silent denial to the last reasoned decision, the court of appeal decision on direct review, as the basis for the state court's judgment on ground one.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (holding that California Supreme Court, by silently denying petition for review, presumably did not intend to change court of appeal's analysis); see also Berghuis v. Thompkins, 560 U.S. 370, 380 (2010) (when state supreme court denies discretionary review of decision on direct appeal, that decision is relevant state-court decision for purposes of AEDPA's standard of review).  Because the court of appeal adjudicated Petitioner's claim on the merits, the Court reviews it under the deferential AEDPA standard of review.  See Richter, 562 U.S. at 98.

Petitioner raised parts of grounds two, six, and seven in his habeas petition in the court of appeal (Lodged Doc. 8), and he subsequently raised grounds two through seven in a habeas petition in the state supreme court (Lodged Doc. 12).  Both courts summarily denied the petitions.  (Lodged Docs. 9, 13.) Absent evidence to the contrary, which does not exist here, a summary denial is presumed to be a decision on the merits.

9

1  Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  Because no

2  reasoned state-court decision exists, the Court conducts an

3  independent review of the record to determine whether the state

4  supreme court, in denying the claims, was objectively

5  unreasonable in applying controlling federal law.  See Haney v.

6  Adams, 641 F.3d 1168, 1171 (9th Cir. 2011) (holding that

7  independent review "is not de novo review of the constitutional

8  issue, but only a means to determine whether the state court

9  decision is objectively unreasonable" (internal quotation marks

10 omitted)); see also Richter, 562 U.S. at 98, 102 (holding that

11 "petitioner's burden still must be met by showing there was no

12 reasonable basis for the state court to deny relief," and

13 reviewing court "must determine what arguments or theories

14 supported or . . . could have supported[] the state court's

15 decision[,] and then it must ask whether it is possible

16 fairminded jurists could disagree that those arguments or

17 theories are inconsistent with the holding in a prior decision of

18 [the Supreme Court]").

19                          **DISCUSSION**

20 **I.  Petitioner's Sufficiency-of-the-Evidence Claims Do Not**

21     **Warrant Habeas Relief**

22      In grounds one through five, Petitioner essentially contends

23 that insufficient evidence supported his convictions for burglary

24 and simple assault.  (Pet. at 5-6.)

25      A.   Applicable Law

26      The Due Process Clause of the 14th Amendment of the U.S.

27 Constitution protects a criminal defendant from conviction

28 "except upon proof beyond a reasonable doubt of every fact

                              10

1  necessary to constitute the crime with which he is charged." <u>In</u>
2  <u>re Winship</u>, 397 U.S. 358, 364 (1970).  Thus, a state prisoner who
3  alleges that the evidence introduced at trial was insufficient to
4  support the jury's findings states a cognizable federal habeas
5  claim.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401-02 (1993).

6        In considering a sufficiency-of-the-evidence claim, a court
7  must determine whether, "after viewing the evidence in the light
8  most favorable to the prosecution, <u>any</u> rational trier of fact
9  could have found the essential elements of the crime beyond a
10 reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)
11 (emphasis in original).  California's standard for determining
12 the sufficiency of evidence to support a conviction is identical
13 to the federal standard enunciated in <u>Jackson</u>.  <u>People v.</u>
14 <u>Johnson</u>, 26 Cal. 3d 557, 576 (1980).  On federal habeas review, a
15 state court's resolution of a sufficiency-of-the-evidence claim
16 is evaluated under 28 U.S.C. § 2254(d)(1) rather than
17 § 2254(d)(2).  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir.
18 2005) (as amended).

19      A federal habeas court reviews a sufficiency claim with an
20 additional layer of deference, in that relief is not warranted
21 unless the state court's application of <u>Jackson</u> was not just
22 wrong but "objectively unreasonable."  <u>Coleman v. Johnson</u>, 132 S.
23 Ct. 2060, 2062 (2012) (per curiam) (internal quotation marks
24 omitted).  Thus, a petitioner faces a "high bar" when challenging
25 on federal due process grounds the sufficiency of the evidence
26 used to obtain a state conviction.  <u>Id.</u>  <u>Jackson</u> "makes clear
27 that it is the responsibility of the jury – not the court – to
28 decide what conclusions should be drawn from evidence admitted at

11

trial." Cavazos v. Smith, 132 S. Ct. 2, 3-4 (2011) (per curiam).
Thus, the reviewing court "cannot second-guess the jury's
credibility assessments"; such determinations are "generally
beyond the scope of review." Kyzar v. Ryan, ___ F.3d ___, No. 12-
17564, 2015 WL 1061892, at *1 (9th Cir. Mar. 12, 2015) (internal
quotation marks omitted).

The reviewing court "must look to state law for the
substantive elements of the criminal offense," although the
"minimum amount of evidence that the Due Process Clause requires
to prove the offense is purely a matter of federal law."
Coleman, 132 S. Ct. at 2064 (internal quotation marks omitted).

Under California law, "burglary consists of entry into a
home or certain other structures 'with intent to commit grand or
petit larceny or any felony.'" People v. Prince, 40 Cal. 4th
1179, 1255 (2007) (quoting Cal. Penal Code § 459); accord People
v. Montoya, 7 Cal. 4th 1027, 1041 (1994). To prove burglary, the
prosecution must establish that a defendant "entered the premises
with the intent to commit a felony or theft." People v. Holt, 15
Cal. 4th 619, 669 (1997) (as modified). "[T]he intent to commit
any felony will sustain a conviction of burglary," regardless of
whether the felony "actually is committed." Montoya, 7 Cal. 4th
at 1041-42 & n.8 (emphasis in original). Such intent "is rarely
susceptible of direct proof and must usually be inferred from all
of the facts and circumstances disclosed by the evidence." Holt,
15 Cal. 4th at 669 (internal quotation marks omitted).[1]

---

[1]Section 459 does not require "breaking" or other prohibited
entry; rather, anyone who enters certain structures with felonious
intent commits burglary. See Descamps v. United States, 133 S. Ct.

1    Proof of the crime of criminal threats, moreover, requires

2    that (1) "the defendant willfully threatened to commit a crime

3    which will result in death or great bodily injury to another

4    person"; (2) "the defendant made the threat with the specific

5    intent that the statement is to be taken as a threat, even if

6    there is no intent of actually carrying it out"; (3) "the threat

7    — which may be made verbally, in writing, or by means of an

8    electronic communication device — was on its face and under the

9    circumstances in which it was made, so unequivocal,

10   unconditional, immediate, and specific as to convey to the person

11   threatened, a gravity of purpose and an immediate prospect of

12   execution of the threat"; (4) "the threat actually caused the

13   person threatened to be in sustained fear for his or her own

14   safety or for his or her immediate family's safety"; and (5) "the

15   threatened person's fear was reasonable under the circumstances."

16   People v. Toledo, 26 Cal. 4th 221, 227-28 (2001) (alterations and

17   internal quotation marks omitted); see also Cal. Penal Code

18   § 422.

19       Under California law, "[a]n assault is an unlawful attempt,

20   coupled with a present ability, to commit a violent injury on the

21

22   2276, 2282 (2013) ("Whereas burglary statutes generally demand
23   breaking and entering or similar conduct, California's does not: It
     covers, for example, a shoplifter who enters a store, like any
24   customer, during normal business hours."); People v. Gauze, 15 Cal.
     3d 709, 713 (1975) (en banc) (noting that under California burglary
25   statute, "every person who enters with felonious intent is a
26   burglar," no matter "whether a person entering a house with
     larcenous or felonious intent does so through a closed door, an
27   open door or a window").  In any event, Petitioner does not contest
     the court of appeal's finding that he entered the store; he argues
28   only that he did so without the requisite intent.

person of another."   Cal. Penal Code § 240.   Assault is a
general-intent crime that does not require a specific intent to
injure the victim, "only . . . an intentional act and actual
knowledge of those facts sufficient to establish that the act by
its nature will probably and directly result in the application
of physical force against another."   People v. Williams, 26 Cal.
4th 779, 782, 790 (2001).   Hence, with an assault charge, "[t]he
pivotal question is whether the defendant intended to commit an
act likely to result in . . . physical force, not whether he or
she intended a specific harm."   Id. at 785 (internal quotation
marks omitted).

    B.   Burglary Conviction

        In ground one, Petitioner contends that insufficient
evidence supported his burglary conviction because no evidence
showed that he "entered with the intent to commit criminal
threats or assault with a deadly weapon." (Pet. at 5.)   In
ground two, he contends that "[t]he elements of burglary were not
proven beyond a reasonable doubt" because "[f]our of the
elements" to prove criminal threats under California Penal Code
section 422 were "not present." (Id.)   Finally, in ground five,
he argues that "[t]he court of appeal ignored the spirit and
intent of CALCRIM 252," which, as he puts it, states that "for a
crime requiring specific intent (such as burglary) the person
must not only intentionally commit the prohibited act, but must
do so with a specific intent and mental state." (Id. at 6.)   For
the reasons discussed below, habeas relief is not warranted on
these grounds.

14

1.   <u>Background</u>

The evidence at trial, which included Alcala's testimony and
security-camera recordings, amply supports a finding that
Petitioner entered the store with the intent to commit a criminal
threat.  Alcala, who was about five feet tall and weighed 180
pounds, testified that on June 24, 2012, he was the only person
working the night shift at the AM/PM gas station on West Avenue K
in Lancaster. (Lodged Doc. 3, 3 Rep.'s Tr. at 1542-44.)  He
testified that he approached Petitioner outside the store "about
three times" that night, telling him not to panhandle and asking
him to leave the premises. (<u>Id.</u> at 1548, 1550-52.)  Alcala
testified that Petitioner was "more aggressive" and "madder" each
time Alcala asked him to leave. (<u>Id.</u> at 1553; <u>see also</u> <u>id.</u> at
1548, 1552.)  At around one a.m. on June 25, 2012, Petitioner
entered the store and was "very aggressive," saying "insulting
words," looking at Alcala, and yelling in a "loud voice since he
opened the door." (<u>Id.</u> at 1554, 1815-16.)  Petitioner yelled
that he was going to "beat [Alcala's] ass." (<u>Id.</u> at 1817.)  No
bullet-proof glass separated Alcala from the people in the store.
(<u>Id.</u> at 1555-56.)  Alcala testified that the only two customers
in the store left without making a purchase; he believed they
left because they were scared. (<u>Id.</u> at 1815, 1827.)

Alcala testified that he was afraid Petitioner was going to
hurt him and did not know whether Petitioner had a weapon. (<u>Id.</u>
at 1816-17; <u>see also</u> <u>id.</u> at 1819 (Alcala testifying that he was
scared).)  Alcala backed up to avoid any punch (<u>id.</u> at 1816), and
he continued to back up as he tried to use his cell phone to look
up the number for the local police station (<u>id.</u> at 1818).

15

Petitioner's voice grew louder as he moved toward Alcala. (<u>Id.</u> at 1819-20.)   Alcala was "very nervous" because Petitioner was close to him. (<u>Id.</u> at 1821.)   Alcala testified that Petitioner, who was apparently either leaning over the counter or on top of it, then threw the cash tray toward Alcala's face "very hard" and with "a lot of force." (<u>Id.</u> at 1823.)[2]   Alcala testified that he moved to one side; had he not, the tray "would have hit [his] face." (<u>Id.</u> at 1823-24.)   He testified that the tray passed about 16 inches from his head and landed on the floor. (<u>Id.</u> at 1824-25.)   Alcala was "very scared" and called 911. (<u>Id.</u> at 1820, 1822.)   Although the incident in the store lasted only about 30 seconds, Alcala testified, "[a]t that time I was scared and it seemed to be . . . endless." (<u>Id.</u> at 1830.)   One of the officers who responded to the 911 call testified that Alcala told him that he felt threatened, although he did not record that in his police report. (<u>Id.</u> at 1882.)

A surveillance video of the incident in the store, taken from several angles, was played for the jury. (<u>See, e.g.</u>, <u>id.</u> at 1557-58, 1801-02, 1820, 1826-27.)   A transcript of the recording showed that Petitioner told Alcala the following:

---

[2]The prosecutor and Petitioner both indicated that Petitioner was on top of the store's counter shortly before he threw the cash tray. (<u>See, e.g.</u>, Lodged Doc. 3, 3 Rep.'s Tr. at 1820 (prosecutor noting that Petitioner was "on the top of the counter"), 1821 (prosecutor noting that Petitioner was "on the counter" and "on top of the counter"), 1822 (prosecutor noting that Petitioner was "on the counter"); Lodged Doc. 3, 4 Rep.'s Tr. at 2167 (Petitioner stating in closing argument that he "climbed up on the counter" before picking up cash tray). <u>But see</u> Lodged Doc. 3, 3 Rep.'s Tr. at 1829 (prosecutor noting that still photograph from surveillance video depicted Petitioner "leaning over onto the counter").)

Don't you ever fucken talk to me like you did before you
bitch . . . if you, fuck you and the cops mother fucken
bitch.  If you ever talk to me like that again I'm gonna
go over this counter and beat the fuck out of you, punk.
Think I'm lying, you think I'm lying?  I'm gonna beat
your mother fucken ass, you bitch.  Fuck you.

[Break]

Don't ever, don't ever talk to me like that again, man.
I'm a soldier, mother fucker.  Call the cops you bitch.
You don't know who you're fucking with, dude.  Fuck you.
Motherfucker.

(Lodged Doc. 1, Clerk's Tr. at 178.)

On direct review, the court of appeal denied Petitioner's
claim that insufficient evidence supported his burglary
conviction:

[Petitioner's] sole contention on appeal is that
there is insufficient evidence supporting his conviction
for burglary.  Specifically, [Petitioner] argues his
conviction for burglary is not supported by substantial
evidence of the requisite specific intent.  We are not
persuaded.

. . . .

The jury found [Petitioner] guilty of second degree
burglary. . . .  As [Petitioner] concedes, "[o]ne may
[be] liable for burglary upon entry with the requisite
intent to commit a felony or a theft . . . whether any
felony or theft actually is committed."  (<u>Id.</u> at pp.
1041-1042; see also CALCRIM No. 1700.)

17

1    At trial, [Petitioner] did not contest he entered
2    the store where Mr. Alcala was working behind the
3    register.  Plainly, the video surveillance tape shown to
4    the jury established he did so.  [Petitioner] contended
5    he did not enter the store with the specific intent to
6    commit either a criminal threat or assault with a deadly
7    weapon.

8    . . . The jury was presented with the testimony of
9    Mr. Alcala, supported by the surveillance video, that
10   after encounters between [Petitioner] and Mr. Alcala
11   escalated in hostility over more than an hour,
12   [Petitioner] returned to the store.  [Petitioner] entered
13   and immediately pointed and yelled at Mr. Alcala,
14   frightening the two customers into leaving the store.
15   [Petitioner] acted increasingly aggressively, moving
16   toward Mr. Alcala, and eventually throwing a cash
17   register tray in the direction of Mr. Alcala's head.  The
18   record and reasonable inferences therefrom solidly
19   support a determination that [Petitioner] entered the
20   store with the specific intent to criminally threaten Mr.
21   Alcala and put him in fear of [Petitioner].  [Petitioner]
22   has not persuaded us there is any basis for disturbing
23   the jury's verdict.

24   (Lodged Doc. 7 at 5-6.)

25        2.   <u>Analysis</u>

26   The state courts were not objectively unreasonable in
27   rejecting Petitioner's sufficiency-of-the-evidence claims.
28   Viewing the evidence in the light most favorable to the

18

prosecution and drawing all reasonable inferences therefrom in its favor, a rational jury could have found beyond a reasonable doubt that Petitioner entered the store with the specific intent to make criminal threats.[3]

Given the evidence showing that after Alcala confronted Petitioner about panhandling at the gas station, Petitioner entered the store in a "very aggressive" manner, immediately yelled that he would "beat the fuck" out of Alcala, and threw a cash tray at his face, a rational factfinder could draw the inference that Petitioner entered the store with the intent to criminally threaten Alcala. See Coleman, 132 S. Ct. at 2064 ("Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at

_____

[3]The court of appeal does not appear to have determined whether sufficient evidence supported a finding that Petitioner entered the store with the intent to commit assault with a deadly weapon. (See Lodged Doc. 7.) The Court therefore addresses only whether the court of appeal was objectively unreasonable in concluding that sufficient evidence showed that Petitioner entered the store with the intent to commit criminal threats. See Sochor v. Florida, 504 U.S. 527, 538 (1992) (noting that "no violation of due process" occurs when "a trial court instructed a jury on two different legal theories, one supported by the evidence, the other not"); Rendon v. Holder, 764 F.3d 1077, 1088 (9th Cir. 2014) (finding that to prove burglary, "the state does not require that the prosecution prove and the jury unanimously find that the defendant intended to commit any particular offense following entry"; "it is sufficient that the defendant had the requisite intent to commit larceny or any felony, whether or not the jurors disagree regarding the particular offense the defendant intended to commit"); Holmes v. Helling, 252 F. App'x 839, 840 (9th Cir. 2007) (finding on habeas review that "[n]otwithstanding [Jackson, 443 U.S. 307], a general verdict need not be set aside merely on the chance . . . that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient" (internal quotation marks omitted, second alteration in original)).

1   trial . . . ."); <u>Payne v. Borg</u>, 982 F.2d 335, 341 (9th Cir. 1992)

2   (as amended) ("<u>Jackson</u> commands that we defer to the rational

3   inferences of the state tribunal regarding [petitioner's]

4   intent."); <u>People v. Carter</u>, 36 Cal. 4th 1114, 1157 (2005) (in

5   prosecution for burglary, felonious intent "may be inferred from

6   all of the facts and circumstances disclosed by the evidence").

7   The court of appeal therefore was not objectively unreasonable in

8   rejecting this claim on direct review.   Petitioner is not

9   entitled to habeas relief on his sufficiency-of-the-evidence

10  claim in ground one.

11       In ground two, Petitioner contends that the elements of

12  burglary were not proved beyond a reasonable doubt.   (Pet. at 5.)

13  Specifically, Petitioner argues that "[f]our of the elements" of

14  criminal threats, the crime he allegedly intended to commit after

15  entering the store, were "not present: (1) [t]here was no threat

16  to kill or inflict great bodily injury; (2) the threat was

17  conditional; (3) there was no sustained fear[;] and (4) there was

18  no evidence of sustained fear."   (<u>Id.</u>)   But contrary to

19  Petitioner's claims, the evidence supports those elements:

20  Petitioner aggressively entered the store (Lodged Doc. 3, 3

21  Rep.'s Tr. at 1554), yelled that he would "go over this counter

22  and beat the fuck out of" Alcala and "beat [his] mother fucken

23  ass" (<u>id.</u> at 1815-16; Lodged Doc. 1, Clerk's Tr. at 178), moved

24  toward Alcala, and threw a cash tray toward his face (Lodged Doc.

25  3, 3 Rep.'s Tr. at 1819-23).   See <u>People v. Butler</u>, 85 Cal. App.

26  4th 745, 753 (Ct. App. 2000) (finding that "it is the

27  circumstances under which the threat is made that give meaning to

28  the actual words used," and "[e]ven an ambiguous statement may be

20

1   a basis for a violation of section 422"); <u>see also</u> <u>In re Ryan D.</u>,
2   100 Cal. App. 4th 854, 861 (Ct. App. 2002) ("To constitute a
3   criminal threat, a communication need not be <u>absolutely</u>
4   unequivocal, unconditional, immediate, and specific"; rather,
5   "the test is whether, in light of the surrounding circumstances,
6   the communication was <u>sufficiently</u> unequivocal, unconditional,
7   immediate, and specific as to convey to the victim a gravity of
8   purpose and immediate prospect of execution" (emphasis in
9   original)).  Moreover, Alcala repeatedly testified that he was
10  very scared and nervous and thought Petitioner was going to hurt
11  him.  (<u>See</u> Lodged Doc. 3, 3 Rep.'s Tr. at 1815-19, 1821-22.)

12      In any event, to support the burglary conviction, the
13  evidence needed only to show that Petitioner intended to make a
14  criminal threat when he entered the store, not that he actually
15  succeeded in completing that crime.  <u>See</u> <u>People v. Allen</u>, 21 Cal.
16  4th 846, 863 n.18 (1999) ("[T]he gist of the [burglary] offense
17  is <u>entry</u> with the proscribed intent, and [] such an entry
18  constitutes the completed crime of burglary regardless of whether
19  any felony or theft actually is committed." (emphasis in
20  original, alteration and internal quotation marks omitted)).
21  Thus, even if Petitioner is correct that some of the elements
22  necessary to establish criminal threats were "not present," that
23  does not undermine the validity of his burglary conviction.
24  Similarly, it does not matter that the jury acquitted Petition of
25  making criminal threats.  <u>See</u> <u>Flores v. Long</u>, No. SACV
26  13-0169-JGB AS, 2014 WL 2611278, at *15 n.16 (C.D. Cal. June 5,
27  2014) (rejecting petitioner's argument "that the jury's
28  determination that he was not guilty of stalking the victim

1  precludes a determination that he entered [the] apartment with
2  the intent to stalk the victim" because "[t]o commit burglary,
3  the underlying felony need be neither committed nor attempted;
4  only the _intent_ to commit the felony is required" (internal
5  quotation marks omitted, emphasis in original)).  The state
6  supreme court was not objectively unreasonable in denying this
7  claim on habeas review.[4]

8      Finally, in ground five, Petitioner contends that the state
9  court of appeal "ignored the spirit and intent of CALCRIM 252,"
10 which, as he puts it, states that "for a crime requiring specific
11 intent (such as burglary) the person must not only intentionally
12 commit the prohibited act, but must do so with a specific intent
13 and mental state."  (Pet. at 6.)  But as discussed above, the
14 court of appeal fully addressed the issue of felonious intent on
15 direct review (_see_ Lodged Doc. 7), and it was not objectively
16 unreasonable in concluding that sufficient evidence supported a
17 finding that Petitioner entered the store with the intent to
18 criminally threaten Alcala.  The state supreme court therefore
19 was not objectively unreasonable in denying this claim on habeas
20 review.

21     For all these reasons, habeas relief is not warranted on
22 grounds one, two, or five of the Petition.

23
_____

24     [4]Petitioner acknowledged on direct review that "[a]ctual
25 commission of the underlying felony is not an element of burglary."
   (Lodged Doc. 4 at 7; _see also_ Lodged Doc. 7 at 5 (court of appeal's
26 finding on direct review that Petitioner "concede[d]" that one may
   be liable for burglary based on intent to commit felony whether or
27 not felony is actually committed).)  He nevertheless raised this
   issue to the state courts on habeas review.  (_See_ Lodged Docs. 8,
28 12.)

22

1

2         C.   Simple-Assault Conviction

3         In ground three, Petitioner contends that the elements of

simple assault were not proved beyond a reasonable doubt, and in

ground four, he contends that insufficient evidence supported his

conviction for simple assault. (Pet. at 5-6; Reply at 3-4.)  In

both grounds, Petitioner relies on the prosecutors' arguments at

the preliminary hearing and at trial that Petitioner committed

felony, not misdemeanor, assault. (Pet. at 5-6; Reply at 3-4.)

He contends that the evidence therefore "clearly shows no intent

by the district attorney to pursue a criminal theory of liability

for simple assault."[5]  (Pet. at 6.)

              1.   Background

         At the close of the preliminary hearing, Petitioner moved to

dismiss the charges against him or, in the alternative, to reduce

two of his felony charges to misdemeanors under California Penal

Code section 17(b).[6]  (Lodged Doc. 1, Clerk's Tr. at 26-29.)  The

_____

[5]Specifically, in ground three, Petitioner contends that the
prosecutor "stated at the close of the preliminary hearing, that
[all] conduct was [felony] conduct – including the assault." (Pet.
at 6 (alterations in original).)  He further argues that in closing
argument at trial, a different prosecutor stated that "this is not
a case where the [Petitioner] maybe swung at Mr. Alcala and missed
. . . [m]isdemeanor conduct, simple assault," and that Petitioner
"changed the case from a misdemeanor assault to a felony when [he]
used the cash tray." (Id. (some alterations in original).)  In
ground four, Petitioner argues that "[f]or the reasons stated in
[g]round three; more specifically, the prosecutor's statements that
the assault was not misdemeanor assault," the evidence was
insufficient to support his assault conviction. (Id.)

[6]Section 17 defines felonies and misdemeanors.  Subsection
(b)(5) provides that the trial court can determine at or before the
preliminary hearing "that the offense is a misdemeanor, in which
event the case shall proceed as if the defendant had been arraigned
on a misdemeanor complaint."

                              23

1  prosecutor opposed Petitioner's requests, arguing, among other
2  things, that

3      [t]he constant testimony was that [Petitioner] entered
4      the room and was acting in an extremely aggressive
5      manner.  The court heard the words that were used.  The
6      victim felt that the conduct was so serious – I think he
7      referred to it several times as extremely aggressive.  He
8      was in fear, an object was thrown at his head, and the
9      People's position is that this is felony conduct.
10  (Id. at 29.)  The court held Petitioner to answer on felony
11  charges of committing criminal threats (Cal. Penal Code § 422),
12  assault with a deadly weapon (§ 245(a)(1)), and burglary (§ 459)
13  and denied his motion to reduce the charges to misdemeanors.
14  (Lodged Doc. 1, Clerk's Tr. at 29-30.)

15      A different prosecutor represented the government at trial.
16  (Compare id. at 9, with Lodged Doc. 3, 3 Rep.'s Tr. at 601.)
17  After the close of evidence, the court informed the parties that
18  it "felt [it] had a sua sponte duty" to include jury instructions
19  for "[California Penal Code section] 240, simple assault, as a
20  lesser included as to count 2," the assault-with-a-deadly-weapon
21  charge.  (Lodged Doc. 3, 4 Rep.'s Tr. at 2112.)  The prosecutor
22  did not object and the court overruled Petitioner's objection.
23  (Id. at 2113-15.)

24      During closing argument, Petitioner stated that he was "on
25  trial for three felonies that I did not commit, and one
26  misdemeanor that I did not commit, and that I should be acquitted
27  of, but the misdemeanor included what the court considers a
28  lesser included instruction . . . I'm not guilty of that either."

(_Id._ at 2187.)  Petitioner asked the jury to find him "not guilty on all three felonies, criminal threats, assault with a deadly weapon and commercial burglary, and . . . the simple assault claim . . . ."  (_Id._)

>    In rebuttal, the prosecutor argued that Petitioner
>    mentioned a charge, simple assault.  Now, the judge is
>    going to read you an instruction of what we call a lesser
>    included.  It's . . . a misdemeanor assault.  The judge
>    is required by law to read you that instruction because
>    it's a lesser included of the assault with a deadly
>    weapon.  And the reason the judge has to read that to you
>    is because if you find [Petitioner] not guilty of assault
>    with a deadly weapon, you can decide whether or not he's
>    guilty of the misdemeanor assault.  But if you find him
>    guilty of the assault with a deadly weapon, you don't
>    even need to consider the misdemeanor assault.
>
>    The reason this case is not a misdemeanor assault is
>    because [Petitioner] changed it from a misdemeanor
>    assault to a felony assault with a weapon when he used
>    that cash tray.  This is not a case where [Petitioner]
>    maybe swung at Mr. Alcala and missed.  Misdemeanor
>    conduct, simple assault.  No, he elevated his conduct to
>    a felony when he picked up that cash tray and threw it
>    directly at Mr. Alcala's face.  So if you find him guilty
>    of the assault with a deadly weapon, you don't even need
>    to consider the simple assault.

(_Id._ at 2192-93.)

1        2.   <u>Analysis</u>

2        The state supreme court was not objectively unreasonable in

3 rejecting grounds three and four on habeas review.  Viewing the

4 evidence in the light most favorable to the prosecution and

5 drawing all reasonable inferences therefrom in its favor, a

6 rational jury could have found beyond a reasonable doubt that

7 Petitioner committed simple assault.

8        As previously discussed, Alcala testified, and the

9 surveillance video apparently showed, that Petitioner forcefully

10 threw a cash tray at Alcala.  (<u>See</u> Lodged Doc. 3, 3 Rep.'s Tr. at

11 1820, 1823.)  Alcala testified that had he not moved to the side,

12 the tray would have hit him in the face.  (<u>Id.</u> at 1823-24.)

13 Given that evidence, a rational trier of fact could have

14 concluded that Petitioner threw the cash tray with knowledge that

15 it would probably result in "the application of physical force

16 against another."[7]  <u>See</u> <u>Williams</u>, 26 Cal. 4th at 782, 790.  As

17 such, the state court was not objectively unreasonable in

18 rejecting Petitioner's claim that insufficient evidence supported

19 his conviction for simple assault.

20        To the extent Petitioner contends that the evidence was

21 insufficient because the prosecutors somehow conceded that he did

22 not commit misdemeanor assault (Pet. at 6), that argument also

23 fails.  The prosecutors nowhere stated that Petitioner was

24

25        [7]Elsewhere in the Petition, Petitioner seems to contend that
he clearly did not throw the tray at Alcala given that it allegedly
26 hit the wall eight to 10 feet away from him.  (<u>See</u> Pet. at 10-11.)
As discussed in Section II, however, the jury viewed surveillance
27 video of the incident from different angles and saw first-hand what
transpired in the store.  Moreover, Petitioner may simply not have
28 aimed well.

innocent of simple assault; rather, they argued either that
Petitioner should be held to answer on the charged felonies (see
Lodged Doc. 1, Clerk's Tr. at 27-29) or that he should be found
guilty of the greater offense of assault with a deadly weapon,
which in fact encompassed all the elements of simple assault (see
Lodged Doc. 3, 4 Rep.'s Tr. at 2192-93); In re Brandon T., 191
Cal. App. 4th 1491, 1498 (Ct. App. 2011) ("Misdemeanor assault is
a necessarily included offense of assault with a deadly
weapon."). Indeed, in closing argument, the prosecutor told the
jury that "if you find [Petitioner] not guilty of assault with a
deadly weapon, you can decide whether or not he's guilty of the
misdemeanor assault." (Lodged. Doc. 3, 4 Rep.'s Tr. at 2192.)
Thus, an independent review of the record shows that the state
supreme court was not objectively unreasonable in rejecting
Petitioner's challenges to the simple-assault conviction, grounds
three and four.

     For the reasons discussed above, habeas relief is not
warranted on grounds one through five.

**II. Petitioner's False-Evidence Claim Does Not Warrant Habeas Relief**

     In ground six, Petitioner contends that the prosecutor
introduced Alcala's "fantastic testimony" at trial and
"manufacture[d] a prosecution." (Pet. at 9-10.) Specifically,
he contends that Alcala

> couldn't get his story straight about the amount of
> encounters between him and the Petitioner; he lied about
> Petitioner being at the gas pumps; he lied about
> Petitioner threatening him before Petitioner entered the

1    store; he lied about Petitioner becoming more aggressive

2    [sic] and angrier, which was after the so-called third

3    encounter, and – by [Alcala's] own testimony and markings

4    on [a photograph], demonstrated that he lied about having

5    to move so as to avoid being hit [by the cash tray].

6    (Pet. at 10 (emphasis in original); see also Reply at 4.)   In

7    ground seven, Petitioner points to those and other purported

8    discrepancies in the evidence, arguing that the prosecutor knew

9    the evidence was false and introduced it anyway.  (Pet. at 10-

10   11.)

11        A.   Applicable Law

12        In Napue v. Illinois, 360 U.S. 264, 269 (1959), the Supreme

13   Court held that "a conviction obtained through use of false

14   evidence, known to be such by representatives of the State,"

15   violates a defendant's right to due process under the 14th

16   Amendment.  See also Jackson v. Brown, 513 F.3d 1057, 1071 (9th

17   Cir. 2008).  To establish a due process violation under Napue, a

18   petitioner must prove that (1) the testimony was actually false,

19   (2) the prosecution knew or should have known that the testimony

20   was false, and (3) the false testimony was material.  Id. at

21   1071-72.  Mere inconsistencies in testimony by government

22   witnesses are insufficient to show actual falsity under Napue.

23   See United States v. Bingham, 653 F.3d 983, 995 (9th Cir. 2011);

24   cf. Hamilton v. Ayers, 583 F.3d 1100, 1111 n.4 (9th Cir. 2009)

25   (finding in context of Brady and Napue claims that "minor and

26   unsurprising discrepancies" in witness testimony not "actual

27   conflict").  False evidence is material if there is "any

28   reasonable likelihood that the false testimony could have

                                 28

1  affected the judgment of the jury." <u>United States v. Agurs</u>, 427

2  U.S. 97, 103 (1976); <u>Libberton v. Ryan</u>, 583 F.3d 1147, 1164 (9th

3  Cir. 2009) (distinguishing standard from one asking whether there

4  was reasonable probability of different outcome).

5      B.   <u>Background</u>

6      At the preliminary hearing, Alcala testified that he went

7  outside to tell Petitioner to leave the gas station at around 11

8  p.m. on June 24, 2012, and then again about 10 minutes later.

9  (Lodged Doc. 1, Clerk's Tr. at 17-18, 24-25.)  Alcala testified

10 that Petitioner "left after that second time," and "about two

11 hours went by" before he returned and confronted Alcala in the

12 store.  (<u>Id.</u> at 18-19.)

13     At trial, Alcala testified that at around 11 p.m. on June

14 24, 2012, he went outside to tell Petitioner, who was "standing

15 . . . by the pump area," to stop asking customers for money.

16 (Lodged Doc. 3, 3 Rep.'s Tr. at 1544, 1547-49.)  Alcala then went

17 back in the store.  (<u>Id.</u> at 1550.)  Alcala later approached

18 Petitioner again, told him that if he did not go away Alcala

19 would call the police, and then went back inside the store and

20 "didn't see him anymore." (<u>Id.</u> at 1551-52.)  Alcala testified

21 that he had to go outside to ask Petitioner to leave "[a]bout

22 three times" and that "during the second time I saw that he was

23 still hanging around out there, so I had to go out again during

24 that same time because he was still there and he wasn't leaving."

25 (<u>Id.</u> at 1552-53.)  Alcala testified that "an hour, an hour and 10

26 minutes" passed from the first time he asked Petitioner to leave

27 to the third time.  (<u>Id.</u>)  He testified that about two hours

28 later, Petitioner returned and confronted him in the store.  (<u>Id.</u>

at 1553-54.)

On cross-examination, Alcala testified that Petitioner threw the cash tray directly at his head, but Alcala moved and the tray hit the wall and fell to the floor. (<u>Id.</u> at 1831-32.)  At Petitioner's request, Alcala marked a photograph to show where he had been standing when Petitioner threw the tray and where the tray struck the wall. (<u>Id.</u> at 1838-40.)  Alcala also testified that Petitioner threatened him before the incident in the store, stating that "[w]hen he was outside bothering people he told me to get back in" and "that [Alcala's] job was not to be outside." (<u>Id.</u> at 1847.)  Petitioner then questioned Alcala about his testimony at the preliminary hearing:

> Q.   By [Petitioner]: Can you explain why you did not mention [Petitioner's earlier threats] at preliminary?
>
> . . . .
>
> A.   Because of stress.  It is very stressful with all the work that you have to do, and all the times that you have to come to court, and I work seven days a week.
>
> . . . .
>
> Q.   [D]o you remember telling the judge at the preliminary hearing that you asked [Petitioner] to leave only twice?
>
> A.   I came to court many times for this problem and I am all stressed out.
>
> The court: Mr. Alcala, when you testified . . . at the preliminary hearing, do you remember saying that it only happened twice; not three times?

1    [Witness]: Well, I could have said that.  It's been

2    a long time since then.[8]

3        Q.   By [Petitioner]: And the first of these two

4    encounters was at 11:00 p.m.?

5        . . . .

6        [A.] Yes.

7        . . . .

8        Q.   By [Petitioner]: And that the second encounter

9    outside was at 11:10, 11:15; is that right?

10       A.   11:15, 11:20, something like that.

11       Q.   Now you said . . . you had to ask [Petitioner]

12   to leave three times. . . .  [A]t what time was that when

13   you had this third encounter with [Petitioner] outside?

14       . . . .

15       A.   The second time that I went outside to tell him

16   to leave I didn't go back to the store.  I stayed out and

17   I wanted to see if he was going to leave or not, and he

18   didn't.  He would continue bothering people.  That's when

19   I told him.

20       Q.   . . . [W]here does the third encounter start

21   and end?

22       A.   I don't remember the exact time, but I did go

23   out to reprimand him two or three times.  I don't

24   remember very well, but I went outside two or three

25   times.

26

27       [8]The preliminary hearing took place on July 12, 2012 (Lodged
     Doc. 1, Clerk's Tr. at 7), and Alcala testified at trial on
28   December 5 (Lodged Doc. 3, 3 Rep.'s Tr. at 1501, 1539).

                              31

1

2          Q.   And the first time you asked [Petitioner] to

3     leave, how long exactly did he hang around?

4          A.   It's been awhile.  Like in all three times that

5     I had to ask him to leave he must have been out between

6     40 minutes to one hour.

7    (Id. at 1847-50.)

8         Petitioner then called Mike Kahn, owner of the AM/PM, as a

9    witness for the defense.  (Id. at 1872.)  Kahn testified that on

10   the night of the incident,[9] he reviewed the surveillance video of

11   the gas-station exterior and did not see Petitioner at the pumps.

12   (Id. at 1876, 1878-79.)  By the time Khan received a subpoena for

13   that video, however, it had already been automatically deleted by

14   the store's surveillance system.  (Id. at 1878.)

15        C.   Discussion

16        The state supreme court's rejection of Petitioner's false-

17   evidence claim was not an objectively unreasonable application of

18   federal law.  Petitioner's argument is largely premised on minor

19   inconsistencies in Alcala's testimony and between his testimony

20   and Kahn's, which are insufficient to prove a Napue violation.

21   See Bingham, 653 F.3d at 995.  For example, Petitioner points to

22   discrepancies in Alcala's testimony regarding the number of times

23   he confronted Petitioner, the length of time between the

24   encounters, and whether Alcala went back inside the store between

25

26        [9]Kahn testified that he reviewed the video "the same night" of
     the incident, which he said was June 24, 2012 (Lodged Doc. 3, 3
27   Rep.'s Tr. at 1877), but Petitioner actually entered the AM/PM
     store and confronted Alcala in the early morning hours of June 25
28   (see id. at 1544-45, 1553-54).

                                    32

1   those confrontations.  (See Pet. at 9-11.)  But on cross-
2   examination, Alcala acknowledged that he may not have testified
3   consistently at the preliminary hearing because he worked seven
4   days a week, had been going to court often, and was "all stressed
5   out."  (Lodged Doc. 3, 3 Rep.'s Tr. at 1848.)  Alcala also
6   testified that he didn't remember the exact events "very well,"
7   and he acknowledged that he could have talked to Petitioner two
8   or three times.  (See id. at 1849-50.)  Moreover, Petitioner
9   admitted during closing argument that he had been panhandling at
10  the AM/PM and that Alcala confronted him, although he argued that
11  it had been earlier in the day and in front of the store, not by
12  the gas pumps.[10]  (See Lodged Doc. 3, 4 Rep.'s Tr. at 2182
13  (stating in closing argument, "I shouldn't have been panhandling
14  in the first place" and "[m]y panhandling has contributed to the
15  circumstances and ultimately contributed to my predicament"); id.
16  at 2182-83 ("I was out there at AM/PM one time earlier that day,
17  but . . . in front of the store for like a few seconds before Mr.
18  Alcala came out.").)

19       Thus, nothing indicates that Alcala testified falsely about
20  the incidents leading up to the confrontation in the store as
21  opposed to simply misremembering the precise details of them.
22  See Daly v. Chavez, No. CV 11-1818-DSF DTB, 2013 WL 5951932, at
23  *19 (C.D. Cal. Nov. 5, 2013) (discrepancies between witness's
24  testimony at trial and preliminary hearing insufficient to

25

26       [10]During cross-examination, Petitioner implied that Alcala had
27  confronted him the afternoon of June 24, 2012, but Alcala testified
    that he didn't work in the afternoons and was not at AM/PM that
28  afternoon.  (Lodged Doc. 3, 3 Rep.'s Tr. at 1861-65.)

1  establish Napue violation).  Similarly, that a defense witness,

2  Khan, testified that he had viewed surveillance video and had not

3  seen Petitioner by the gas pumps also fails to establish that

4  Alcala's testimony was false.  See United States v. Croft, 124

5  F.3d 1109, 1119 (9th Cir. 1997) ("that a witness may have made an

6  earlier inconsistent statement, or that other witnesses have

7  conflicting recollections of events, does not establish that the

8  testimony offered at trial was false").  Indeed, it could have

9  been Khan, not Alcala, who was mistaken.

10       Petitioner also argues that "the inference of falsity" is

11  supported by Alcala's "own markings" on a photograph that showed

12  that "he was in one corner, and the [cash] tray made contact with

13  the other" with a distance of "8-10 feet between the two

14  corners."  (Pet. at 10.)  But even assuming that is true,[11] it

15  establishes merely a potential inconsistency in Alcala's account

16  of the incident.  And in any event, the jury viewed surveillance

17  video of the incident from different angles, so it saw first-hand

18  what transpired in the store.  (See, e.g., Lodged Doc. 3, 3

19  Rep.'s Tr. at 1554-58, 1813, 1820, 1826-27, 1843-44, 1851-53; see

20  also id. at 1801-02 (discussing that video of incident

21  encompassed numerous camera angles).)  At its request, the jury

22  viewed the video during its deliberations.  (Lodged Doc. 3, 4

23  Rep.'s Tr. at 2401-02.)  Petitioner, moreover, cross-examined

24  Alcala at trial (Lodged Doc. 3, 3 Rep.'s Tr. at 1830-66), called

25  Khan as a witness (id. at 1872-79), and argued some of the

26  _____

27       [11]In his state court of appeal habeas petition, Petitioner
    asserted that the markings showed "a distance of at least (5) feet
28  between the points."  (Lodged Doc. 8 at 4.)

purported inconsistencies in closing argument (Lodged Doc. 3, 4 Rep.'s Tr. at 2164, 2182-83). Thus, the cited inconsistencies were fully explored before the jury, which apparently did not find them troubling enough not to convict Petitioner. See United States v. Geston, 299 F.3d 1130, 1135 (9th Cir. 2002) (when "two conflicting versions of the incident were presented to the jury," "[i]t was within the province of the jury to resolve the disputed testimony").

Petitioner's claim also fails because he points to nothing in the record showing that the prosecutor knew or should have known that Alcala's testimony was allegedly false and introduced it anyway. See Bingham, 653 F.3d at 995 (finding that petitioner cited no evidence of "intentional use of perjured testimony," and court "cannot presume that the prosecutor knew that the prior inconsistent statement was true but elicited perjured testimony anyway" (alteration and internal quotation mark omitted)); see also Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004) (as amended) ("The essence of the due process violation is misconduct by the government, not merely perjury by a witness."). Rather, Petitioner simply speculates, citing no supporting evidence, that the prosecutor "encouraged" Alcala to change his testimony or that she should have concluded, based on the cited inconsistencies, that Alcala was lying. (Pet. at 10-11.) That is not enough. See Skains v. California, 386 F. App'x 620, 621-22 (9th Cir. 2010) (rejecting Napue claim when petitioner "offers only speculation that the prosecutor knew or should have known that [witness's] impeachment testimony was inaccurate at the time it was given").

1   Finally, Petitioner's claim must fail because the purported

2   inaccuracies in Alcala's testimony would not have been reasonably

3   likely to have affected the verdict.  The basis of Petitioner's

4   convictions for burglary and simple assault was the incident in

5   the store, which was captured from five angles on surveillance

6   video and played several times for the jury.  That evidence alone

7   likely sufficiently supported the verdicts.  See Gentry v.

8   Sinclair, 705 F.3d 884, 904 (9th Cir.) (as amended) (rejecting

9   false-evidence claim when "the DNA, eyewitness, and other

10  circumstantial evidence were more than sufficient for a jury to

11  convict [petitioner] without considering the [false] testimony"),

12  cert. denied, 134 S. Ct. 102 (2013).[12]

13  Habeas relief is not warranted on Petitioner's false-

14  evidence claims in grounds six and seven.

15  **III.**  **Petitioner's Prosecutorial-Misconduct Claim Does Not Warrant**

16      **Habeas Relief**

17  In ground seven, Petitioner also contends that the

18  prosecutor engaged in misconduct by misstating material facts to

19  obtain a conviction.  (Pet. at 10-11.)  Most of Petitioner's

20  arguments relate to his allegations of Napue error, which fail

21

22  [12]To the extent Petitioner contends that the purported
    inconsistencies in the testimony render his convictions unsupported
23  by substantial evidence, that argument fails because a federal
    habeas court faced with a factual record "that supports conflicting
24  inferences must presume . . . that the trier of fact resolved any
    such conflicts in favor of the prosecution, and must defer to that
25  resolution." Jackson, 443 U.S. at 326; see also Schlup v. Delo,
    513 U.S. 298, 330 (1995) ("[u]nder Jackson, the assessment of the
26  credibility of witnesses is generally beyond the scope of
    review.").
27

28

1   for the reasons discussed above.   To the extent Petitioner raises

2   a separate claim that the prosecutor misrepresented the facts in

3   closing argument by arguing that Petitioner threw the cash tray

4   intending to hit Alcala (see id. (contending that prosecutor

5   "could clearly see it was inherently improbable for the drawer to

6   have hit any part of the victim's body" but argued in closing

7   that "the victim was over in the corner (in fear) while

8   Petitioner was supposedly attacking him" (emphasis in original)),

9   that argument also fails.

10      Prosecutorial misconduct warrants habeas relief only if it

11  "so infected the trial with unfairness as to make the resulting

12  conviction a denial of due process." Darden v. Wainwright, 477

13  U.S. 168, 181 (1986) (internal quotation marks omitted).   After

14  establishing misconduct, a petitioner also must show prejudice,

15  in that the misconduct "rendered the trial fundamentally unfair."

16  See Wood v. Ryan, 693 F.3d 1104, 1116 (9th Cir. 2012).   "[T]he

17  touchstone of due process analysis in cases of alleged

18  prosecutorial misconduct is the fairness of the trial, not the

19  culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209,

20  219 (1982).   The alleged misconduct must be examined within the

21  context of the entire trial.   United States v. Young, 470 U.S. 1,

22  12 (1985).

23      Petitioner has failed to show that the prosecutor engaged in

24  any misconduct or that his trial was somehow rendered

25  fundamentally unfair.   During closing argument, the prosecutor

26  simply urged the jury to convict Petitioner based on the facts

27  adduced at trial, arguing that the evidence – which included

28  Alcala's testimony and the surveillance video – showed that

Alcala was scared and that Petitioner threw the cash tray toward Alcala, among other things. (See, e.g., Lodged Doc. 3, 4 Rep.'s Tr. at 2151-55.)  The prosecutor did not commit misconduct in doing so.  Indeed, "[c]ounsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253 (9th Cir. 1996) (internal quotation marks omitted).  Petitioner has failed to show that the prosecutor misstated the evidence or deprived him of any other constitutional right.  See Darden, 477 U.S. at 181-82 (finding petitioner not deprived of fair trial in part because "[t]he prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused").  The trial court, moreover, repeatedly instructed the jury that the arguments of counsel were not evidence. (See Lodged Doc. 3, 3 Rep.'s Tr. at 1512; Lodged Doc. 3, 4 Rep.'s Tr. at 2122, 2162); Darden, 477 U.S. at 182 (finding petitioner not deprived of fair trial in part because "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence").

Petitioner is not entitled to habeas relief on this ground.

1

**CONCLUSION**

2          IT THEREFORE IS ORDERED that Judgment be entered denying the

3    Petition and dismissing this action with prejudice.

4

5    DATED: <u>March 31, 2015</u>

6                                              JEAN ROSENBLUTH
                                               U.S. MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

39